# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Committed Intimate Relationship of, | No. 53794-0-II consolidated with No. 54267-6-II |
| LEONARD CARPENTER DEWITT, | |
| Appellant, | |
| and | UNPUBLISHED OPINION |
| ESTATE OF KEVIN WILLIAM HANNAN, | |
| Respondent. | |

MAXA, J. – In this consolidated appeal, Leonard Dewitt appeals the trial court's dismissal on summary judgment of a lawsuit he filed against Kevin Hannan[1] alleging that they had a committed intimate relationship (CIR). He also appeals the trial court's post-judgment order stating that Dewitt was not entitled to legal possession of Hannan's house and other trial court rulings.

This case arose from Dewitt's claim that he and Hannan were in a CIR from 2002 to 2018. Hannan asserted that the only "relationship" he had with Dewitt during that time was in the context of an intermittent sexual partner. Dewitt was living in a house owned by Hannan

---

[1] Hannan died after this appeal was filed, and the estate of Kevin Hannan was substituted as the respondent. This opinion will refer to Hannan rather than to the estate.

when this lawsuit was filed, and he refused to leave following the trial court's summary judgment ruling.

A CIR is a stable, marital-like relationship where both parties live together as a couple knowing that they are not lawfully married. If a CIR existed and then was terminated, a trial court must make an equitable distribution of property that would have been community property if the couple had been married. To determine whether a CIR existed, courts apply a five-factor analysis identified in *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995).

We conclude that (1) the evidence shows that as a matter of law, application of the *Connell* factors shows that Dewitt and Hannan did not have a CIR at any time from 2002 to 2018; (2) because there was no CIR, the trial court was not required to equitably distribute Hannan's property; (3) the trial court did not err in ordering Dewitt to vacate Hannan's house and in ruling that Dewitt was not entitled to legal possession of Hannan's house; (4) the trial court did not abuse its discretion when it awarded attorney fees as a discovery sanction; and (5) the trial court did not abuse its discretion when it denied Dewitt's additional motions.

Accordingly, we affirm the trial court's grant of summary judgment in favor of Hannan, the post-judgment order stating that Dewitt was not entitled to legal possession of Hannan's house, and the trial court's other rulings.

FACTS

*Background*

Dewitt and Hannan met in 2002 when Dewitt was 21 years old and Hannan was 43. They had some type of relationship from 2002 until June 2018, including being sexual partners. However, the parties dispute the nature of that relationship.

Dewitt also had a long-term friendship with Leonard Haan, beginning in 2005. Dewitt lived with Haan at his house located at 2106 S. 25th Street in Tacoma for some period of time between 2005 and 2016. Dewitt and Haan filed petitions for domestic violence protective orders (DVPOs) against each other in May 2016. They apparently resolved their differences later.

Over the years, Haan has assisted Dewitt in various legal proceedings. Haan has submitted multiple declarations and letters on Dewitt's behalf in various cases.

In 2011, Hannan purchased a house located at 2916 North Lawrence Street in Tacoma (the Tacoma house) with his own funds. In January 2018, Hannan purchased a Cadillac with his own funds. Also in 2018, he purchased a second house in Morton in 2018 with his own funds.

Dewitt alleges that he began living full time in the Tacoma house in 2016. He continued living there for several months after the trial court dismissed his CIR complaint.

In June 2018, Dewitt filed a petition for a DVPO against Hannan, requesting that Hannan be excluded from their shared residence, the Tacoma house, and that Dewitt be granted the use of Hannan's 2018 Cadillac. The trial court issued a DVPO to Dewitt against Hannan by default because Hannan did not appear at the hearing. Hannan claimed that he was never served with the petition and did not find out about it or the order until later. The DVPO subsequently was terminated.

*Complaint and Procedural History*

In July 2018, Dewitt filed a "Complaint to End Committed Intimate Relationship and Divide Property and Debts – Unmarried Couple" naming Hannan as the respondent. The complaint alleged that the parties had lived in a CIR from July 2002 until June 18, 2018. The complaint further alleged that the parties owned community-like property that the court should equitably divide pursuant to the principles stated in *Connell*. Specifically, Dewitt requested to be

3

awarded the Tacoma house and the Cadillac and asked the court to divide Hannan's other assets. The summons stated that Dewitt would accept legal papers at Haan's residence address.

In his answer, Hannan admitted that he and Dewitt had been acquainted for a number of years, but denied that they ever had been in a CIR. Hannan also denied that the parties owned community property and alleged that Dewitt was fraudulently attempting to take possession of his property.

In January 2019, Dewitt filed a motion for a temporary family law order. He requested an order stating that he could possess and use the Tacoma house and the Cadillac. In the motion, Dewitt stated that he had lived in the Tacoma house since 2016. In April, Hannan filed a motion for temporary family law order and restraining order, requesting an order requiring Dewitt to move out of the Tacoma house. The trial court subsequently ordered that Dewitt could reside in the Tacoma house and that Hannan would reside in his house in Morton.

On April 9, Hannan sent interrogatories and discovery requests to Dewitt. Dewitt never responded to Hannan's discovery requests in full. Hannan subsequently filed a motion to compel discovery, and on June 21 the trial court granted the motion. The order stated that Hannan did not need not provide discovery to Dewitt until Dewitt responded to Hannan's discovery. The court awarded Hannan $765 in attorney fees as a discovery sanction.

On June 12, Hannan's attorney received an unfiled, four-page complaint from Dewitt naming Hannan, his attorney, and his attorney's law firm as defendants in a tort action. There is no indication in the record that this complaint was ever filed.

On June 14, the trial court permitted Dewitt's attorney to withdraw in anticipation of a successful settlement and to permit Dewitt to file for a motion for a continuance so that he could seek new counsel if the case did not settle.

On June 24, Dewitt filed a declaration and a motion for an order that included four motions: (1) for reconsideration of the June 21 order to compel discovery, (2) to compel discovery from Hannan, (3) to stay or continue the trial to allow him to find a new attorney and to enter into more settlement negotiations, and (4) to consolidate the CIR action with the unfiled contract and tort complaint. The trial court later denied these motions as part of the summary judgment order.

*Summary Judgment Motions*

On July 2, Hannan filed a summary judgment motion, arguing that there was no CIR between him and Dewitt as a matter of law. Hannan also requested the court to return the Tacoma house to his possession. Dewitt did not file a response to Hannan's motion. Instead, Dewitt filed his own motion for summary judgment on July 12, arguing that there was a CIR as a matter of law. Hannan filed a response to Dewitt's motion.

In support of his summary judgment motion, Hannan did not file any new declarations. He relied on April 9 and April 23, 2019 declarations he had submitted relating to his motion for a temporary family law order. In addition, he submitted hundreds of pages of exhibits. The exhibits included three declarations from Dewitt and one declaration from Haan that had been filed in prior proceedings.

In support of his summary judgment motion, Dewitt also did not file any declarations. He submitted a number of miscellaneous documents. Hannan filed a declaration in response to Dewitt's motion.

*Hannan's Evidence*

In his April 9 declaration, Hannan stated:

I have known the Petitioner for fifteen or sixteen years, and during that time we have occasionally been sexually intimate. However, we never lived together, or

even dated. Our relationship was fundamentally a casual one, and certainly did not rise to the level of a committed intimate relationship, much less a marriage.

Clerk's Papers (CP) at 319. He continued:

I met Leonard DeWitt about 15 years ago at a club. We exchanged numbers and were casual acquaintances. I would see him two or three times a year, usually in social and/or public settings – such as clubs or bars. Occasionally – *very* rarely – if I was hosting a gathering or a dinner party, I would invite him over. We were intimate on occasion, but these were very isolated incidents – they were never more than one-night stands. Again, I only saw him a few times a year, and there were often months, or periods of two or three years when I did not see him at all.

In 2011 I moved to Tacoma and saw Mr. DeWitt somewhat more frequently, but still very rarely. Mr. DeWitt slept over at my house a few times, but we never moved in together, and we were never more than very casual (and infrequent) sexual partners. My last one-night stand with Mr. DeWitt was in May of 2018.

CP at 322.

Hannan stated that he gave Dewitt a key to his house and access to his debit cards and checkbook in April 2018 only while Dewitt was helping him with contractors who were repairing his kitchen following a fire. Hannan soon noticed a number of unauthorized purchases and cash advances. He submitted identity theft, theft, and fraud complaints to the Tacoma Police Department and Federal Trade Commission.

In addition, Hannan stated that Dewitt had been in a committed romantic relationship with Haan for over 13 years, notwithstanding Dewitt's one night stands with Hannan. Hannan stated, "As far as I know, Mr. Haan and Mr. DeWitt are a couple and have been in a committed dating relationship for years." CP at 324.

In his April 23 declaration, Hannan stated:

Mr. DeWitt has never "lived" with me. He has stayed over at my residence occasionally, but he never moved in. We never combined households or finances. We have definitely not been "continuous partners" and I have not financially supported Mr. DeWitt except in that he has been living without my permission, rent free, in my home for the better part of the last year.

6

CP at 743. Hannan continued:

> If Mr. DeWitt wants to establish a Committed Intimate Relationship, he's going to need a lot more than what is essentially a series of one-night stands to back up his claim. Again, I have *known* Mr. DeWitt for about sixteen years, but our relationship has been extremely casual. It is true that Mr. DeWitt and I occasionally had sex, but I have had many other partners throughout the years in addition to Mr. DeWitt – as has Mr. DeWitt, who, as previously mentioned, has been in an *actual* committed intimate relationship with Mr. Haan for the last 14 years or so.
> . . . .
>
> I am not, and never have been, in any kind of serious relationship with Mr. DeWitt beyond that of an infrequent sexual partner.

CP at 744.

Hannan also submitted the declarations of four witnesses. His sister, Karen Owens, stated that Hannan had never mentioned Dewitt to him. Morgan Murray stated that he had known Hannan for 27 years, and would visit him at the Tacoma house every couple of weeks. He stated that he did not meet Dewitt until 2018, when Hannan hired Dewitt to help repair his kitchen after a fire. Scott Wright had known Hannan for 14 years, and stated that "[h]e has not been in a relationship for the entire time I have known him." CP at 790.

Norman Schieke had known Hannan for 21 years. He stated that he and Hannan had been part owners of a nightclub from January 2013 to January 2016, and "I can say without reservation during that 3-year period, he was not involved in a spousal relationship." CP at 787. Schieke also stated that he was Hannan's neighbor and frequently would drive by his home, and "confidently know he has resided alone." CP at 787.

Hannan also submitted additional evidence relevant to Dewitt's relationship with Haan:

• A December 2005 declaration from Haan in Dewitt's dissolution proceedings with his former wife, stating that he was assisting Dewitt with child support payments, referencing

7

Dewitt's son "visiting us," CP at 478, and stating that it was not fair "for Leonard and I to have to pay child support for times when [Dewitt's son] is with us." CP at 479.

- A February 2009 letter from Haan to a court that was sentencing Dewitt on a criminal conviction stating, "Leonard has been my partner for four years. Together we are raising his son . . . . We live in Tacoma." CP at 562.

- A December 2014 declaration from Haan in a lawsuit Dewitt had filed, stating that he resided at 2106 South 25th Street in Tacoma and that DeWitt "has lived with me at this address for approximately 8 or 9 years." CP at 509.

- Dewitt's May 2016 petition for a DVPO against Haan stating that he and Haan were current or former domestic partners, and asking the court to order Haan to vacate their "shared residence." CP at 525.

- The May 2016 DVPO issued against Haan stating that "[p]etitioner shall have exclusive right to the residence petitioner and respondent share" and listing Dewitt's address as 2106 S. 25th Street in Tacoma. CP at 532.

- Haan's May 2016 declaration in connection with his petition for a DVPO stating that Dewitt "abandoned his residency on April 1, 2016 (our 11th yr anniversary)" and that Dewitt had been residing in Seattle with "his new boyfriend(s)." CP at 544.

*Dewitt's Evidence*

Dewitt's declarations characterize his relationship with Hannan differently. In a December 2018 declaration, he stated: "A relationship which has survived sixteen years is not a one-night stand." CP at 887. In an April 19, 2019 declaration, Dewitt stated:

> I have lived at this particular residence as part of our committed intimate relationship on a regular full-time basis since 2016. Prior to that, I lived with Kevin more on an "on and off" basis due to the dynamics of our relationship. I have stayed over at my mother's house and friends' homes during periods when Kevin needed

8

space. But we were continuous partners during that time and he was financially supportive throughout. The change in laws about gay marriage and his retirement made it possible for me to always live with him.

CP at 837.

Dewitt continued:

He put the moves on me when I was 21 years old and, for the next sixteen years told me I was his only one and that he would take care of me. Gay marriage was not even allowed at that time. I was the "stay at home" and he was the man that went out to make the money. Our relationship was more than sexual as we were companions and he cried on my shoulder constantly about his difficulties at work dealing with the straight men that he worked with. At least he had me. I can't even count the number of times we have been "sexually intimate" over the last sixteen years but I agree that the last time was in May 2018. . . . [W]e were very close and watched TV, laughed, comforted each other, went shopping, went out to eat and other companion type of things. Other than him trying to keep a low profile about his sexuality (especially in the early years), we did all the normal things that a married couple does.

CP at 839.

In an April 23, 2019 declaration, Dewitt stated that he had to do many things for Hannan, "almost to a caregiver level," and that being supportive of Hannan was time consuming. CP at 794. Dewitt stated that he was "run ragged supporting Kevin in all of his needs whether sexual or otherwise." CP at 796. He emphasized that "behind every successful man there is a person supporting them through all of the stresses and difficulties. The fact that I am male does not suddenly erase all of the contributions I have made to our unique household over the last sixteen years." CP at 796.

Dewitt concluded:

I have always lived with Kevin rent free. That is because I was considered like a spouse and contributed in my ways. Kevin always told me since day one that I was the only one and we had an exclusive relationship. . . . There was never any objection on Kevin's part to receive the benefits of my contributions until now that he wants to unfairly disregard my life and everything that I have brought to the table in our very traditional style committed intimate relationship.

9

CP at 796-97.

Regarding his relationship with Haan, Dewitt stated in his April 19, 2019 declaration that Haan "has definitely been a good friend, emotional support, and advocate in some situations. But we have never been intimate like me and Kevin." CP at 840. He further stated:

> Just because someone is a friend and had allowed me to stay at their residence when I had to be away from Kevin does not mean that suddenly we are in the committed intimate relationship. Mr. Haan and I have never had sexual intimacy like Kevin and I and there is no documentation which says that we did. The only documentation that Kevin has unearthed is that we ever lived together for any period of time. This does not erase what Kevin and I had.

CP at 795.

Dewitt explained that Haan's 2106 S. 25th Street address served as his registered address for certain situations. However, he also admitted that he "officially[] stopped residing at 2106 S. 25th Street . . . after Mr. Haan and I got into some issues." CP at 888. That was in May 2016. In a declaration, Haan stated that Dewitt had been living with Hannan at the Tacoma house full time since 2016.

David Boardman, who had known Dewitt for 10 years, stated in a declaration that Dewitt had been with Hannan during the entire time Boardman had known him. He also stated that Dewitt started staying at the Tacoma house as early as 2011, but moved in full time in 2016. Boardman stated, "By then the entire situation with Leonard Haan, i.e. being friends, attempting for a short time to be boyfriends, but ending up just friends had ended." CP at 880.

Travis Tufts, who had known Dewitt since before he was 21, stated in a declaration:

> I know he has had a very long relationship with Kevin Hannan and has been a friend of Leonard Haan for less time than he has known Kevin. He still lives at the residence in north Tacoma on Lawrence Street where he has lived ever since he moved off hilltop in approximately 2016. He used to live with Leonard Haan as friends, then possible boyfriends, then back to friends.

CP at 924.

10

Additional summary judgment evidence suggested that Dewitt and Hannan were living together between 2016 and 2018.

*Trial Court Ruling*

On July 22, 2019 the trial court heard oral argument on the summary judgment motions. In an oral ruling, the court engaged in a lengthy analysis of the *Connell* factors in concluding that a CIR did not exist. In the course of its ruling, the court made a statement that "I'm conceding that there may be a committed intimate relationship here; even so, it's short." Report of Proceedings (RP) at 23.

The court entered an order granting Hannan's motion for summary judgment and denying Dewitt's motion for summary judgment. The court ordered Dewitt to vacate the Tacoma house by July 26. The court also stated that Dewitt was liable to Hannan for any damage to the Tacoma house in an amount to be determined at a subsequent hearing. The court denied Hannan's request for attorney fees under CR 11, but awarded Hannan attorney fees incurred in preparation for and attending the hearing, stating that a judgment for attorney fees would be entered separately.

On July 24, Dewitt filed a notice of appeal of the trial court's order granting Hannan's summary judgment motion and denying Dewitt's motions for summary judgment, to consolidate, stay or continue, compel discovery, and reconsider.

*Second Appeal*

On July 26, Hannan returned to his Tacoma house and found out that Dewitt had not vacated the property. Dewitt continued to claim that he had a right to possess the property.

Hannan filed a motion for a restraining order against Dewitt regarding his continued occupation of the Tacoma house and subsequently filed a motion for contempt. On November 7,

11

a superior court commissioner issued an order regarding possession of property, stating that Dewitt was not entitled to any legal possession of the Tacoma house or any other property belonging to Hannan and that Dewitt was not permitted to be on Hannan's property.

On December 4, Dewitt filed a notice of appeal of the order regarding possession of property. This court consolidated the two appeals.

## ANALYSIS

A.    EXISTENCE OF A CIR

Dewitt argues that the trial court erred in granting summary judgment in favor of Hannan regarding the existence of a CIR. He claims that the evidence showed the existence of a CIR as a matter of law when applying the *Connell* factors.[2] Hannan argues that the undisputed evidence establishes that there was no CIR when applying the *Connell* factors. We agree with Hannan.

1.    Standard of Review

We review a trial court's decision on a summary judgment motion de novo. *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 182, 401 P.3d 468 (2017). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). A genuine issue of material fact exists if reasonable minds could disagree on the conclusion of a factual issue. *Zonnebloem*, 200 Wn. App. at 182-83. We view all facts and reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Id.* at 182.

---

[2] Dewitt also argues that the trial court did not apply the proper summary judgment standard because the court stated that it found good cause to approve the order in the summary judgment order. But because our review is de novo, it is immaterial whether the trial court applied the wrong standard. In any event, there is no indication that the court applied the wrong standard in analyzing the summary judgment motions.

The moving party bears the initial burden of proving that there is no genuine issue of material fact. *Id.* at 183. Once a moving defendant shows that there is an absence of evidence to support the plaintiff's case, the burden shifts to the plaintiff to present specific facts that rebut the defendant's contentions and show a genuine issue of material fact. *Id.*

2. Legal Principles

A CIR (once known as a meretricious relationship) "is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist." *Connell*, 127 Wn.2d at 346. The CIR doctrine is used to distribute property that unmarried people acquire during their marital-like relationship that would have been community property had they been married. *In re Amburgey*, 8 Wn. App. 2d 779, 787, 440 P.3d 1069 (2019). If a trial court determines that a CIR existed and has terminated, the court may equitably divide that property in a manner similar to that in a marriage dissolution. *Id.* There is a rebuttable presumption that all property acquired during a CIR belongs to both parties and is subject to equitable distribution. *Connell*, 127 Wn.2d at 351.

In determining whether a CIR existed, courts consider five factors identified in *Connell*: (1) continuity of cohabitation, (2) "duration of the relationship"; (3) "purpose of the relationship"; (4) "pooling of resources and services for joint projects"; and (5) "intent of the parties." *Id.* at 346; *see also In re Marriage of Pennington*, 142 Wn.2d 592, 601, 14 P.3d 764 (2000). Whether a CIR existed depends on the specific facts of each case. *Pennington*, 142 Wn.2d at 602. The *Connell* factors "are simply the tools that courts use to better consider the equities that encompass a CIR analysis." *Muridan v. Redl*, 3 Wn. App. 2d 44, 62, 413 P.3d 1072 (2018). Relevant here, the CIR doctrine applies to same-gender relationships. *See Vasquez v. Hawthorne*, 145 Wn.2d 103, 107, 33 P.3d 735 (2001).

13

The CIR doctrine is grounded in equitable principles. *Pennington*, 142 Wn.2d at 602. Determining whether a CIR existed ultimately is based on whether the nature of the relationship justifies the equitable division of property acquired during the course of the relationship. *See id.* at 605, 607.

Here, Hannan and Dewitt provide radically different characterizations of their relationship. However, because this case was decided on summary judgment, we must view all the evidence in the light most favorable to Dewitt. *Zonnebloem*, 200 Wn. App. at 182.

3.    Continuity of Cohabitation (Factor 1)

Dewitt does not deny that there were periods of separation during his relationship with Hannan. He claims that they at times lived separately because Hannan required his sexual practices to remain secret because of his job at Boeing. Dewitt also argues that his relationship with Haan did not affect the continuity of his cohabitation with Hannan.

Hannan emphasizes that the evidence is undisputed that Dewitt lived for substantial periods of time with Haan between 2005 and May 2016. As a result, any cohabitation was sporadic and not continuous during that period. Hannan concedes for purposes of this appeal that there was evidence of continuous cohabitation from mid-2016 until 2018, but argues that this brief period does not affect the CIR analysis.

Dewitt admitted in one of his declarations that he lived with Hannan full time only since 2016 and before that lived with him on an "on and off" basis. Other witnesses confirmed that Dewitt did not live in Hannan's house full time until 2016. Dewitt claimed that he lived with his mother and with friends when Hannan needed space but that their relationship was continuous.

In addition, there is extensive, undisputed evidence in the record that Dewitt and Haan lived together as a couple between 2005 and May 2016. As early as December 2005 Haan

suggested in Dewitt's dissolution proceedings that he and Dewitt were living together. Haan told a court in 2009 that Dewitt had been his partner for four years, they lived in Tacoma, and they were raising Dewitt's son together. In December 2014, Haan stated under oath that Dewitt had lived with him at the 2106 South 25th Street address for eight or nine years.

More recently, in Dewitt's own petition for a DVPO against Haan in May 2016, he stated under oath that he and Haan were current or former domestic partners and asked the court to order Haan to vacate the residence they shared. The May 2016 DVPO issued against Haan stated that Dewitt would have exclusive right to the residence he and Haan shared at 2106 S. 25th Street. Haan's May 2016 declaration in connection with his petition for a DVPO stated that Dewitt abandoned his residency on their 11th anniversary. Dewitt admitted in a December 2018 declaration that he "officially[] stopped residing at 2106 S. 25th Street . . . after Mr. Haan and I got into some issues." CP at 888. Those issues arose in May 2016.

Even declarations submitted to support Dewitt acknowledged his relationship with Haan. Two witnesses stated that Dewitt lived with Haan as friends, then as boyfriends, and then as friends again before Dewitt moved in with Hannan full time in 2016. Haan's December 2018 declaration stated that in early 2018 he had a conversation with Hannan about how there were no hard feelings that he and Dewitt had attempted to be boyfriends.

Significantly, Dewitt did not dispute any of the evidence showing that he lived with Haan for approximately 11 years, until May 2016. He only vaguely stated that "[j]ust because someone is a friend and had allowed me to stay at their residence when I had to be away from Kevin does not mean that suddenly we are in the committed intimate relationship." CP at 795. And he stated that he and Haan "have never been intimate like me and Kevin," CP at 840, and

"never had sexual intimacy like Kevin and I." CP at 795. But the issue here is the continuity of Dewitt's cohabitation with Hannan, not whether he and Haan had a CIR.

Dewitt's various attempts to justify the periods of separation does not comport with the underlying purpose of the overall *Connell* analytical framework – whether the relationship between two parties rises to the level of a *stable*, *marital-like* relationship. *See Pennington*, 142 Wn.2d at 601. Moreover, under *Pennington*, the "continuous cohabitation" factor is analyzed in the context of the entire alleged CIR period, and here, Dewitt claims that a CIR began in 2002 and terminated in 2018. *See id.* at 606.

In one of the consolidated cases in *Pennington*, the Supreme Court found that the continuous cohabitation factor was not established when a couple who lived together for the majority of a 10 year period were separated for almost two years. 142 Wn.2d at 603. Pennington and Van Pevenage lived together for almost six years, but then Van Pevenage moved out for 19 months. *Id.* 595-97, 603. During this time, Van Pevenage had a sexual relationship with another man and lived with him briefly, and Pennington dated another woman. *Id.* at 597, 603. Pennington and Van Pevenage then lived together again for a year before the relationship terminated. *Id.* at 597, 603. The court determined that their "cohabitation was sporadic and not continuous enough to evidence a stable cohabiting relationship." *Id.* at 603.

The facts here show a much more sporadic cohabitation than in *Pennington*. It is undisputed that Dewitt did not live with Hannan full time until after May 2016 and Dewitt lived with Haan for significant periods for 11 years. *Pennington* compels the conclusion that Dewitt cannot satisfy this factor.

Viewed in the light most favorable to Dewitt, his cohabitation with Hannan was continuous for approximately two years from 2016 through 2018. But in *Pennington*, the fact

16

that the parties resumed living together for a year following a separation did not satisfy the continuous cohabitation factor. *Id.* Similarly here, a two-year period of cohabitation when viewed in light of a 16-year long relationship is insufficient to establish this factor. *See Pennington*, 142 Wn.2d at 603, 605-06.

Dewitt claims that the continuous cohabitation factor somehow applies differently for same gender couples, who in past years might have had to hide their relationship. But he fails to cite any authority to support this proposition. And the Supreme Court did not state that a different analysis applied when holding that the meretricious relationship doctrine applies to same-sex relationships. *Vasquez*, 145 Wn.2d at 107.

Dewitt cites *Foster v. Thilges*, 61 Wn. App. 880, 812 P.2d 523 (1991) and *Warden v. Warden*, 36 Wn. App. 693, 678, 676 P.2d 1037 (1984) to argue that this court should disregard or minimize the periods of separation during the alleged CIR. Neither case is helpful to Dewitt.

In *Foster*, the court determined that a meretricious relationship existed despite the fact that one party was still legally married to another during at least part of their relationship. 61 Wn. App. at 884. But the unmarried couple in *Foster* lived together *continuously* for over 10 years, purchased several properties together with joint funds, shared joint bank accounts, made retirement plans together, and conducted themselves like a married couple in public. *Id.* at 884-85. None of those facts are present here.

In *Warden*, the court held that property acquired by an unmarried couple during the course of their relationship "which is tantamount to a marital family except for a legal marriage" should be divided in a just and equitable manner. 36 Wn. App. at 698. There, an unmarried couple had two children together and sometimes lived separately in different states or countries for prolonged periods due to the one party's job requirements. *Id.* at 694-95. But the couple

held themselves out as husband and wife, shared the same last name, signed joint income tax returns, purchased a house together, and one party financially supported his family even when he did not live in the same household. *Id.* None of those facts are present here.

We conclude that even viewing the evidence in the light most favorable to Dewitt, he cannot establish the continuous cohabitation factor.

4. Duration of the Relationship (Factor 2)

Both Dewitt and Hannan agree that they knew each other for approximately 16 years. Therefore, we conclude that the duration of their relationship satisfies the second *Connell* factor. But the length of their relationship alone is insufficient to establish a CIR. *See Pennington*, 142 Wn.2d at 604. The key is the nature of that relationship, which the other factors address.

5. Purpose of the Relationship (Factor 3)

Dewitt argues that the purpose of his relationship with Hannan was for intimacy and companionship, primarily relying on the contention that he fulfilled a homemaker and sexual partner role in Hannan's life. Hannan responds that Dewitt's characterization of the purpose of the relationship is not supported by any legal authority or any evidence in the record. Instead, he argues that the true purpose of Dewitt's relationship with Hannan was to gain control of Hannan's assets.

Dewitt's declarations allege that the purpose of his relationship with Hannan was more than sexual intimacy, but also involved companionship, his emotional support of Hannan, and his tending to Hannan's needs. Although Hannan disputes the nature of the relationship, Dewitt's allegations must be taken as true. *See Zonnebloem*, 200 Wn. App. at 182.

However, as with the duration factor, these purposes do not necessarily require a finding that a CIR existed. In *Pennington*, the court concluded that there was sufficient evidence to

support the trial court's conclusion that the purpose of the parties' relationship included "companionship, friendship, love, sex, and mutual support and caring." 142 Wn.2d at 605. Nevertheless, the court concluded that when balancing the *Connell* factors and evidence as a whole, a CIR did not exist. *Id.*

      6.    Pooling of the Resources (Factor 4)

Dewitt argues that he satisfies the pooling of the resources factor because he provided spousal support to Hannan as a homemaker. In response, Hannan argues that there is no evidence or any allegations by Dewitt that the parties ever combined their finances.

The purpose of the pooling of the resources factor is to discern whether the parties have "jointly pooled their time, effort, or financial resources enough to require an equitable distribution of property." *Pennington*, 142 Wn.2d at 607. In *Pennington*, Pennington and Van Pevenage shared some living expenses, such as spending money on food and kitchen utensils. 142 Wn.2d at 604. And Van Pevenage cooked meals, cleaned house, and helped with interior decoration. *Id.* But the court concluded that the limited, sporadic household expenditures, coupled with the absence of any evidence that Van Pevenage made "constant or continuous payments jointly or substantially invested her time and effort into any specific asset," did not establish the existence of any pooling of financial resources. *Id.* at 604-05.

In the companion case of Chesterfield and Nash, the court also concluded that the couple did not pool their financial resources, despite the fact that the couple had a joint checking account for living expenses, shared mortgage payments, and assisted each other with administrative chores. *Id.* at 606. The court found it significant that the couple maintained separate bank accounts, did not purchase any property jointly, and contributed separately to their respective retirement accounts. *Id.* at 606-07.

19

Here, there is no evidence that Dewitt and Hannan intertwined their finances, such as joint bank accounts, shared living expenses, or shared mortgage payments. The Tacoma house and the Cadillac both were in Hannan's name only. Dewitt simply alleges that Hannan was financially supportive, and that Hannan was the one who made the money while he stayed home.

Dewitt alleged that he contributed to the relationship in many ways. And he argues that a type of pooling of resources occurs when one partner works and the other stays home and takes care of the household. In *Pennington*, the trial court found that Van Pevenage cooked meals, cleaned house, and helped with interior decoration. 142 Wn.2d at 604. But that fact, along with some sharing of expenses, was not enough to show that "the parties jointly invested their time, effort, or financial resources in any specific asset to justify the equitable division of the parties' property." *Id.* at 605.

Dewitt also claims that he was given free reign of Hannan's financial cards. However, the only evidence in the record that may reference Dewitt's claim is that Hannan gave him access to his debit cards and his checkbook to facilitate Dewitt's work with the kitchen repair.

We acknowledge that in some cases, one partner's nonfinancial contributions to a relationship may be a significant factor in assessing the existence of a CIR. Nevertheless, we conclude that under the facts of this case, Dewitt cannot establish the pooling of the resources factor.

7. Intent of the Parties (Factor 5)

Dewitt argues that the length and nature of his relationship with Hannan supports the conclusion that there was mutual intent to maintain a CIR. He also emphasizes that Hannan did not have a relationship with anyone else. Hannan argues that Dewitt offers no corroborating evidence to show that there was mutual intent to be in a CIR. He also emphasizes that the length

20

of the relationship does not mean that there was an intent to form a CIR. Finally, Hannan highlights the fact that he and Dewitt did not hold themselves out to the public as a couple.

The intent of the parties factor refers to whether the parties mutually intended to be in a CIR. *See Pennington*, 142 Wn.2d at 604, 606. The court in *Pennington* considered whether the parties had the "intent to live in a stable, long-term, cohabiting relationship." *Id.* at 604. The court concluded that the mutual intent factor was not established because of Van Pevenage's repeated absences from Pennington's home and her relationship with another man. *Id.*

Significantly, Dewitt offers no direct evidence that the parties had a mutual intent to form a CIR. None of Dewitt's declarations state that *he* intended to form a CIR, much less that there was such a mutual intent. The question here is whether mutual intent can be inferred when viewing the evidence in a light favorable to Dewitt. But as with the continuous cohabitation factor, the undisputed evidence that Dewitt did not live full time with Hannan until after May 2016 and lived for significant periods with Haan for 11 years negates any reasonable inference that there was a mutual intent to form a CIR. And the facts here show less of a mutual intent than in *Pennington*.

We conclude that Dewitt cannot establish the intent of the parties factor.

8. Balancing of Factors

In determining whether a CIR exists, we must consider the factors as a whole. *Pennington*, 142 Wn.2d at 602. As discussed above, Dewitt cannot establish the continuous cohabitation, pooling of resources, and intent of the parties factors. Arguably, these are the three most important factors. In the absence of all three factors, Dewitt cannot show the type of "stable, marital-like relationship" necessary to find a CIR. *Connell*, 127 Wn.2d at 346. We conclude that as a matter of law, the nature of the relationship between Dewitt and Hannan does

not justify the equitable division of property acquired during the course of their relationship. *See Pennington*, 142 Wn.2d at 605, 607.

Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Hannan.

B.    EQUITABLE DISTRIBUTION OF PROPERTY

Because we conclude above that no CIR existed between Hannan and Dewitt, there is no basis for an equitable distribution of property. *See Pennington*, 142 Wn.2d at 605, 607. " 'It is inappropriate to ascribe common law, marriage-related property rights to those who have not timely proved that there is a CIR in the first place.' " *Amburgey*, 8 Wn. App. at 788 (quoting *In re Kelly*, 170 Wn. App. 722, 737, 287 P.3d 12 (2012)).

Dewitt claims that the trial court conceded that there was a CIR beginning in 2016, and therefore he is entitled to an equitable division of Hannan's assets and specifically the Tacoma house. Dewitt relies on the trial court's statement during its oral ruling that "I'm conceding that there may be a committed intimate relationship here; even so, it's short." RP at 23. However, the court did not rule that a CIR did exist beginning in 2016, just that it may have existed. In any event, our review is de novo, and we find above that a CIR never existed.

C.    POSSESSION OF HANNAN'S TACOMA HOUSE

In both of his appeals, Dewitt argues that the trial court lacked authority to evict him from the Tacoma house. He apparently challenges the trial court's ruling in the summary judgment order that Dewitt had to vacate the Tacoma house, and the commissioner's post-judgment order stating that Dewitt was not entitled to any legal possession of the Tacoma house and that Dewitt was not permitted to be on Hannan's property. We disagree.

Dewitt contends that the only relief that he requested was a determination of the existence of a CIR and that the trial court had no authority to grant additional relief. As a result, he claims that the trial court had no authority to evict him from the Tacoma house in the absence of an unlawful detainer action.

However, there is no question that the primary focus of Dewitt's CIR action was to obtain possession and ownership of the Tacoma house. In addition, the only basis for Dewitt's claim to possession and ownership was the existence of a CIR. He did not contend that he was a tenant or had any other legal right to remain in the house. Therefore, the trial court's ruling on summary judgment that a CIR did not exist necessarily established that Dewitt had no legal right to possession of the house.

Further, Dewitt's reliance on the unlawful detainer statute is misplaced because that statute applies only to tenants. *See* RCW 59.12.020, .060. As noted, Dewitt has never claimed that he was a tenant at the Tacoma house and such a claim would be inconsistent with his CIR claim.

Finally, Dewitt cites no cases supporting the proposition that a trial court has no authority to order an unsuccessful CIR claimant to vacate the defendant's property without using an unlawful detainer procedure. As a result, we do not impose a limitation of the trial court's authority in an equitable action.

Dewitt also argues that the eviction violated RCW 59.12.220. That statute provides that property must be restored to the defendant's possession pending appeal when a writ of restitution has been entered prior to the appeal and the defendant posts a bond. RCW 59.12.220. But here, no writ of restitution was issued and Dewitt has not posted a bond. Therefore, RCW 59.12.220 is inapplicable.

23

In addition, Dewitt vaguely suggests that the trial court contravened the April 2019 temporary family law order stating that he reside at the Tacoma house. However, Dewitt provides no argument to explain why that temporary order somehow was binding on the trial court. Therefore, we need not address this issue. *Cave Props. v. City of Bainbridge Island*, 199 Wn. App. 651, 667, 401 P.3d 327 (2017).

We reject Dewitt's argument that the trial court unlawfully evicted him from the Tacoma house.

D.      AWARD OF ATTORNEY FEES AS DISCOVERY SANCTION

Dewitt claims that the trial court erred in awarding Hannan attorney fees as a sanction for Dewitt's failure to respond to Hannan's discovery.[3] We disagree.

Absent a protective order under CR 26(c), a party is required to answer or object to an interrogatory or a request for production. *Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 584, 220 P.3d 191 (2009). Under CR 37(d), a trial court can order a party who fails to respond to discovery to pay the attorney fees caused by the failure. *Id.* at 592. We review an award of discovery sanctions for abuse of discretion. *Id.* at 593.

In the June 21, 2019 order compelling discovery, the trial court imposed sanctions against Dewitt for failure to timely respond to Hannan's discovery requests. There is no question that the court had authority under CR 37(d) to award attorney fees to Hannan. Dewitt does not

---

[3] It is unclear from his opening brief what attorney fee award Dewitt is appealing. However, Hannan waived the attorney fees awarded in the trial court's summary judgment order. And in his supplemental brief, Dewitt argued that it was unfair to award attorney fees for a mistake his withdrawing attorney made. Similarly, in his fourth brief, Dewitt states that the trial court punished him for failing to produce one page of discovery. Therefore, we assume that Dewitt is appealing the award of $765 as a discovery sanction.

provide an explanation for his failure to provide his discovery responses or why the trial court erred in imposing sanctions.

Accordingly, we hold that the trial court did not err in awarding attorney fees against Hannan as a discovery sanction.

E.      ADDITIONAL MOTIONS

Dewitt vaguely claims that the trial court erred in denying his motions (1) for reconsideration of the June 21 order to compel discovery, (2) to compel discovery from Hannan, (3) to stay or continue the trial, and (4) to consolidate the CIR action with an unfiled complaint. We decline to address these claims because Dewitt did not support them with any meaningful argument.

We generally do not address claims that are not supported by argument. *Cave Props.*, 199 Wn. App. at 667. Here, Dewitt fails to support his arguments with any substantial analysis, any citations to legal authorities, and any citations to the record. Instead, he makes only brief, vague, and conclusory statements regarding the additional motions. Accordingly, we decline to address Dewitt's claims regarding his additional motions.[4]

## CONCLUSION

We affirm the trial court's grant of summary judgment in favor of Hannan, the post-judgment order stating that Dewitt was not entitled to legal possession of Hannan's house, and the trial court's other rulings.

---

[4] In any event, we conclude that none of Dewitt's arguments regarding the trial court's additional rulings have merit.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
SUTTON, A.C.J.

_____
CRUSER, J.